UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>　　　　　Plaintiff,<br><br>v.<br><br>N'GUESSAN YAO AND MICHAEL BARRY SHOR,<br><br>　　　　　Defendants.<br><br>REPUBLIC OF THE COTE D'IVOIRE,<br><br>　　　　　Petitioner. | Case No. CR-10-00434 RMW<br><br>**ANCILLARY PROCEEDING**<br><br>**ORDER GRANTING THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT AND DENYING THE COTE D'IVOIRE'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>**[Re Docket Nos. 142, 144]** |

This ancillary proceeding relates to $3,923,030 ("the funds") which this court forfeited from defendants N'Guessan Yao ("Yao") and Michael Barry Shor ("Shor") in sentencing them for conspiracy to export arms illegally. The Republic of the Cote d'Ivoire ("Cote d'Ivoire") asserts ownership of the funds and petitions the court pursuant to 21 U.S.C. § 853(n)(6) for a determination of lack of forfeitability of its ownership interest. The government moves for summary judgment that the Cote d'Ivoire possesses no ownership interest in the funds under § 853(n)(6) and seeks a final order of forfeiture of the funds to the United States. The Cote d'Ivoire cross-moves for

summary judgment that it is the sole owner of the funds and seeks an order granting ownership of the funds to the sovereign.

At the hearing on the parties' cross-motions, the Cote d'Ivoire brought to the court's attention a discovery issue regarding the Cote d'Ivoire's alleged inability to obtain the requisite discovery to defeat the government's motion for summary judgment. "[I]n abundance of caution," the court permitted the Cote d'Ivoire to file an affidavit pursuant to Federal Rule of Civil Procedure 56(d) indicating the discovery it sought to obtain "that could establish that the transaction was unauthorized by the Ivorian government." Order, Dkt. No. 153 at 3. Having considered the parties' arguments with respect to the cross-motions for summary judgment and the Rule 56(d) affidavit,[1] the court concludes that the Cote d'Ivoire does not possess a superior ownership interest in the forfeited funds and no further discovery could create an issue of fact to defeat the government's motion. Accordingly, the court GRANTS the United States' motion for summary judgment and DENIES the Cote d'Ivoire's cross-motion.

## I. BACKGROUND

Laurent Gbagbo was declared president of the Cote d'Ivoire in October 2000 following a controversial election.[2] Violent and deadly opposition rallies against President Gbagbo followed the election, causing the United Nations Security Council, in November 2004, to implement an arms embargo (Resolution 1572) on the Cote d'Ivoire. The embargo was continued by at least three succeeding United Nations Security Council Resolutions and remained in effect during the entire conspiracy alleged in the underlying lawsuit.

In July 2009, in an effort to equip the Ivoirian Gendarmerie for the then upcoming November 2009 presidential election, Ivoirian officials wrote to the United Nations requesting an exception to the arms embargo. July 2, 2009 Letter from Cote d'Ivoire to United Nations, Pet'r's Mot., Ex. 1, Dkt. No. 144-2. Specifically, the Cote d'Ivoire requested permission to import 4,000 automatic pistols, 200,000 rounds of 9mm ammunition, and 50,000 teargas grenades. *Id.* The

---

[1] The government filed a response to the Cote d'Ivoire's Rule 56(d) affidavit on October 8, 2013.
[2] The Cote d'Ivoire gained independence from France in 1960. In 1993, Henri Konan Bedie won Cote d'Ivoire's first multi-party presidential election. President Bedie remained in power until 1999 when he was overthrown in a military coup led by Robert Guéï. Following a controversial election and an uprising that forced Guéï to flee the country, Lawrence Gbagbo, was declared president in October 2000.

ORDER
Case No. C-10-00434 RMW
AG / GH
- 2 -

1   United Nations responded by directing the Cote d'Ivoire to paragraph 21 of Resolution 1572, which
2   provides that requests for exceptions from the embargo must be "submitted in writing by the . . .
3   State or the International organization or agency *supplying* the equipment." July 30, 2009 Letter
4   from United Nations to Cote d'Ivoire, Pet'r's Mot., Ex. 2, Dkt. No. 144-3 (emphasis added).

5   In light of the United Nations' response, the Cote d'Ivoire's Minister of Defense, Michel
6   Amani N'Guessan ("Minister Amani"), contacted criminal defendant Shor, an arms dealer and
7   broker, to aid in the purchase of the Arms. Dep't of Homeland Security Report at 4, Pet'r's Mot.,
8   Ex. 3. Amani and Shor agreed that Shor would be the exclusive purchasing agent of the arms for
9   the Ivoirians, and in return, Shor would give Minister Amani a fifty percent cut of his commission
10  from the sale. *Id.* Shor then reached out to a merchant he knew to help carry out the Ivoirian's arms
11  order. *Id.* at 5. The merchant was charged with an unrelated offense in the Northern District of
12  California, and he agreed to be a cooperating defendant ("CD") in the case against Shor. *Id.* To
13  assist the United States, the CD put Shor in touch with a United States Immigration and Customs
14  Enforcement ("ICE") Undercover Agent, who agreed to help Shor procure the arms. *Id.* Shor also
15  independently approached American Dive and Supply about procuring the arms. *Id.*

16  Shor explained to both the ICE Undercover Agent and American Dive and Supply that the
17  requisite approval process would require the exporter to apply for exemption from the United
18  Nations' arms embargo and would also require the approval of the United States Secretary of State,
19  Hilary Clinton. *Id.* In view of the approval process, American Dive and Supply declined the
20  contract because it did not believe it could secure the requisite approval before the Ivoirian elections
21  that Fall. *Id.* In contrast to American Dive and Supply's response, the ICE Undercover Agent told
22  Shor there were "other options":

> ICE Undercover Agent: . . . what we can do is we can go through [the State Department and United Nations] first but just so you know there's alternative ways to do this . . . . I have several shipping partners overseas who are more than willing to do this, you know and, and believe me they want to avoid any US Customs headache or any hassles . . . it costs a little bit more, it it's a little more costly but the headache is must less . . .
>
> Shor: OK
>
> ICE Undercover Agent: . . . that is an option if you, if you, if the UN and the State Department aren't comfortable with this, there are other options.

> Shor: Right. That's good to know, and I was hoping you would say that, at some point I wanted to cross that bridge.

Aff. in Supp. of Arrest Warrant in *United States v. Shor* ("*Shor* Affidavit") ¶ 27, Dkt. No. 1 (filed Apr. 21, 2010). Shor referred to these "other options" as "Plan B." *Id.* ¶ 28.

In a recorded phone call with the CD, on August 28, 2009, Shor decided to resort to "Plan B." *Id.* In carrying out Plan B, Shor, the CD, and the ICE Undercover Agent agreed that the Cote d'Ivoire would transfer a fifty percent payment as a guarantee for the total amount by wire transfer to the ICE Undercover Agent's account in San Jose ("ICE San José account"). *Id.* ¶ 34. On a recorded September 14, 2009 phone call, Shor told the ICE Undercover Agent and the CD that he was "nervous" about the transaction "because of the possible ramifications we all know and understand." *Id.* ¶ 35. Shor also disclosed that his partner was Minister Amani. *Id.* The following day, on a recorded call, Shor asked the ICE Undercover Agent when he would obtain his commission. *Id.* ¶ 38. Shor stated that his commission was 560,000 dollars total, to be split with Minister Amani, who Shor said was giving him "a little pressure." *Id.* It appears that the purchase prices on the arms were "marked up" to account for Shor's commission in the total contract price. *Id.* ¶¶ 31-32.

On September 28, 2009, ICE agents observed Shor and the Military Attaché from the United Nations Embassy to the Cote d'Ivoire, board a flight from Regan National Airport to Ft. Lauderdale, Florida. *Id.* ¶¶ 44-45; Gov't Sentencing Mem. in *United States v. Yao* 4-5, Dkt. No. 87. In Ft. Lauderdale, Shor and the Military Attaché were observed allegedly discussing shipping methods and prices for the arms. *Id.*

On April 12, 2010, Shor and the ICE Undercover Agent agreed on a total price of $3,923,030. *Shor* Affidavit ¶ 48. Shor requested "one invoice for the weapons and one dummy invoice with alternate commodity." *Id.* The ICE Undercover Agent sent Shor two "dummy invoices" so that he could choose which one to send to the Ivoirians. *Id.* ¶ 52. The first "dummy invoice" was for the purchase of telecommunication equipment (later edited to computer equipment) and the second was for the purchase of electrical equipment. *Id.*

On April 21, 2010, acting on behalf of the Cote d'Ivoire, Ivoirian advisor to the Mission of the Republic of Cote D'Ivoire to the United Nations in New York, Jean Chislain N'Gbichi, wired

half of the purchase price, $1,961,515, into the ICE San José account from a bank account in New York that serves the Ivoirian mission to the United Nations. Bank Records, Pet'r's Mot., Ex. 5, Dkt. No. 144-4. Although the Cote d'Ivoire never received the arms, it nevertheless wired the remaining $1,961,515 into the ICE San José account on September 9, 2010. *Id*   As a third-party petitioner, the Cote d'Ivoire asserts a superior property interest under § 853(n)(6)(A) in the $3,923,030 forfeited by defendants Yao and Shor when they were sentenced for conspiring to export arms to the Cote d'Ivoire in violation of the United Nations' trade sanction and the United States' export control laws.

## II. ANALYSIS

### A. Criminal Forfeiture Generally

Because third parties are barred from intervening in a criminal case, *see* 21 U.S.C. § 853(k), a third party claiming an interest in a criminal defendant's forfeited property must petition the court in an ancillary proceeding to determine the validity of the asserted interest, *see* 21 U.S.C. § 853(n)(2). "State law determines whether a claimant has a property interest, but federal law determines whether or not that interest can be forfeited." *United States v. Hooper*, 229 F.3d 818, 820 (9th Cir. 2000). Once a third party petitioner establishes under state law that it has a legitimate property interest, it can defeat the criminal forfeiture in only two ways: (1) by demonstrating by a preponderance of the evidence that the property interest was vested in the petitioner rather than the defendant, or that petitioner's interest was superior to any interest of the defendant, at the time of the commission of the acts which gave rise to the forfeiture, *see* 21 U.S.C. § 853(n)(6)(A); or (2) by demonstrating by a preponderance of the evidence that the petitioner was a bona fide purchaser for value of the property, and was without knowledge that the property was subject to forfeiture when the third party acquired the property interest, *see* 21 U.S.C. § 853(n)(6)(B). The Cote d'Ivoire only asserts a superior property interest under § 853(n)(6)(A).

Because Minister Amani wired the funds in question to the undercover ICE account in San José, California law determines whether the Cote d'Ivoire has a property interest in the funds. *See United States v. Lester*, 85 F.3d 1409, 1412 (9th Cir. 1996) (applying law of state where property is located). California law is clear that in wiring the funds, the Cote d'Ivoire transferred title to the

financial institution receiving the funds for the benefit of the account holder. *See e.g.*, *Bernard v. Sheaffer*, 96 F.3d 1279, 1282 (9th Cir. 1996) (citing *Crocker-Citizens Nat'l Bank v. Control Metals Corp.*, 566 F.2d 631, 637 (9th Cir. 1977) ("It is a well-settled principle of California law that . . . when funds are deposited, title to those funds passes immediately to the bank."). Under federal law, the funds, once voluntarily transferred, became subject to forfeiture as the proceeds of an illegal transaction. *See* 21 U.S.C. §§ 853(a), (c).

### B. Constructive Trust

The Cote d'Ivoire argues, relying on the constructive trust theory in *United States v. Wilson*, 659 F.3d 947, 953-54 (9th Cir. 2011), that it retained a property interest in the funds that was superior to the defendants' at the time Minister Amani wired the funds to the Immigration and Customs Enforcement ("ICE") account in San Jose ("San Jose account"). Under California law, a constructive trust arises when a person gains property to which he or she is not justly entitled through "fraud, accident, mistake, undue influence [or] the violation of a trust or some other wrongful act." Cal. Civ. Code § 2224; *United States v. 4,224,958.57 (Boylan)*, 392 F.3d 1002, 1004 (9th Cir. 2004). The fraudster who acquired the property wrongfully becomes an "involuntary" trustee of the property for the victim. Cal. Civ. Code § 2223. Under this theory, if the criminal defendants in the underlying action (and the government by way of forfeiture) obtained the funds through "fraud, accident, undue influence . . . or some other wrongful act," the United States government would be the "involuntary trustee" of the Cote d'Ivoire's property and the Cote d'Ivoire would retain a "superior" interest sufficient to defeat criminal forfeiture under § 853(n)(6)(A). *See United States v. Wilson*, 659 F.3d 947, 953-54 (9th Cir. 2011).

To establish that a constructive trust was created upon the transfer of the funds to the San José account, the Cote d'Ivoire must identify a "wrongful act" that induced it to part with the funds. For example, in *Wilson*, the defendant Wilson committed the underlying crimes of mail fraud, among others, to induce the third-party petitioner to invest in a fraudulent investment fund. *Id.* at 949-50. Accordingly, the court held that a constructive trust existed and the petitioner's interest in the fund could not be forfeited. *Id.* at 955. In *Wilson* it was clear that the petitioner was a victim of, and not a participant in, the wrongful or fraudulent acts.

ORDER
Case No. C-10-00434 RMW
AG / GH
- 6 -

Here, the Cote d'Ivoire accuses Minister Amani, criminal defendant Shor and the United States' government agents involved in the illegal transaction of defrauding or otherwise wrongfully inducing the Cote d'Ivoire to purchase the illegal arms. Unlike the situation in *Wilson*, however, where it was clear that the petitioner was not a participant in the wrongful activity, all appearances in this case suggest that Minister Amani was acting on behalf of the petitioner, the Cote d'Ivoire, when he transferred the Cote d'Ivoire's funds to purchase arms *for the sovereign*. If this is the case, Minister Amani's actions bind the sovereign, and the Cote d'Ivoire is essentially alleging under the constructive trust theory that it conspired to defraud itself. Thus, to succeed on a constructive trust theory, as a threshold matter, the Cote d'Ivoire must demonstrate that Minister Amani's actions were not attributable to the sovereign.

### 1. Parties' Arguments

The Cote d'Ivoire first argues that Minister Amani's and defendant Shor's actions in entering into the illegal transaction were *ultra vires* and done for the purpose of defrauding the Cote d'Ivoire. Accordingly, the Cote d'Ivoire contends that it was a victim of the wrongful acts of Minister Amani and Shor, and thus a constructive trust formed when it transferred the funds to the ICE's San José account. The Cote d'Ivoire argues in the alternative that, even if the sovereign ultimately *knew* that the transaction was illegal, the sovereign still retains a superior property interest under the constructive trust theory because it was "a victim" of bad faith representations of the United States government agents promulgating the fraudulent transaction.

The government counters that a constructive trust was not formed because there is no evidence to suggest that Minister Amani or other participants somehow convinced or defrauded the Ivoirian government, under president Gbagbo at the time, into believing that the sovereign was, in fact, entering into a legal transaction. The government contends that the record strongly suggests the opposite: that the Ivoirian government was fully aware of the illegality of the transaction and voluntarily entered into it. According to the government, there is no evidence that the United States government agents acted in bad faith to induce the Ivoirian government to enter into the illegal contract. The government argues that its agent sent Minister Amani a letter explaining that the export of the arms would be illegal, which Minister Amani signed and acknowledged well before

consummating the transaction. Even if the government agents were at fault, the government asserts under the doctrine of *in pari delicto* that, as a participant in an illegal transaction, the Cote d'Ivoire is barred from obtaining the court's assistance to recover money voluntarily paid in furtherance of an illegal transaction. *See Kardoh v. United States*, 572 F.3d 697, 700 (9th Cir. 2009) ("[T]he *in pari delicto* doctrine . . . prevent[s] the return of money voluntarily paid to a government agent in an illegal transaction." (citing Eighth and Third Circuit case law)).

### 2. Actions of Foreign Officials Generally Bind the Sovereign

The current government of the Cote d'Ivoire (now under Prime Minister Alassane Ouattara) seems to generally suggest in its moving papers that it is not bound by the actions of Minister Amani and the former Gbagbo regime, but this is incorrect. The current government is bound by the actions of officials from a previous government unless those actions are not attributable to the Cote d'Ivoire as a sovereign. *See, e.g.*, *The Sapphire*, 78 U.S. 164, 168 (1870) ("The reigning Emperor, or National Assembly, or other actual person or party in power, is but the agent and representative of the national sovereignty. A change in such representative works no change in the national sovereignty or its rights."); *see also Republic of Iraq v. ABB AG*, No. 08-5951, 2013 WL 441959, at **15-17 (S.D.N.Y. Feb. 6, 2013).

In determining whether a government official's action is attributable to the sovereign, courts consider whether the official committed the misconduct for *personal* financial gain or in furtherance of a *public* goal. *Compare Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1359 (9th Cir. 1988) (en banc) *with Iraq*, 2013 WL 441959, at **17-18. In the former situation, the conduct might not be attributable to the sovereign. *See Philippines*, 862 F.2d at 1359 (holding that, where the former leader of the republic of Philippines diverted public funds for private financial gain, his actions could not be attributed to the sovereign). In the latter situation, however, the actions of the foreign official are generally attributable to the sovereign. *See, e.g.*, *Iraq*, 2013 WL 441959, at *17 ("The Complaint alleges a public goal, undertaken with public resources, pursued for political purposes, and using means available only to state actors[, which] lead[s] the Court to conclude the Hussein Regime acted under the color of its authority as the government of Iraq for the purposes of this motion.").

Even if the Cote d'Ivoire were able to prove that Minister Amani and defendants Shor and Yao were *not* authorized by the Ivoirian government or legally entitled to enter into the arms contract, a state may nevertheless be held responsible for the actions of its officials where those acts were not authorized or were expressly forbidden by law, based on the totality of the circumstances. *See* Restatement (Third) of Foreign Relations Law of the United States § 207 cmt. d (1987).

> A state is responsible for acts of officials and official bodies, national or local, *even if the acts were not authorized by or known to the responsible national authorities, indeed even if expressly forbidden by law, decree, or instruction*. In determining whether an act was within the authority of an official or an official body, or was done under color of such authority (clause (c)), one must consider all the circumstances, including whether the affected parties reasonably considered the action to be official, whether the action was for public purpose or for private gain, and whether the persons acting wore official uniforms or used official equipment.

*Id.* (emphasis added); *see also id.* § 207 n.4.

### 3. Application

Here, the entire transaction, with the possible exception of the kickback from Agent Shor's commission (addressed *infra*), was for the benefit of the *sovereign*, to arm the Ivoirian Gendarmerie, and not for Minister Amani's personal pursuits. In contrast to the *Philippines* case, where the former president's actions were for private financial gain, here, Amani's actions were primarily for a public purpose: to obtain arms to benefit the Cote d'Ivoire's Gendarmerie. This case is closer to the *Iraq* case, where Amani's actions were in pursuit of a "public goal, undertaken with public resources, pursued for political purposes, and using means available only to state actors." 2013 WL 441959, at *17.

The Cote d'Ivoire's argument that the actions of its official representatives, in wiring funds to the ICE San José account, are not attributable to the Cote d'Ivoire as a sovereign are unconvincing and unsupported by evidence. The Cote d'Ivoire admits that Minister Amani was aware that the weapons were going to be illegally exported. At least criminal defendant Shor and Minister Amani, as well as other unnamed Ivorian "co-conspirators," were aware at the time the agreement was made that the arms would have to be exported illegally from the United States. *See* Aff. in Supp. of Arrest Warrant in *United States v. Yao* ("*Yao* Affidavit") 3-4, Dkt. No. 1 (filed Sept.

9, 2010); *Shor* Affidavit ¶¶ 27-30; Gov't Sentencing Mem. in *United States v. Yao* ("*Yao* Sentencing Mem.") 4, Dkt. No. 87 (Co-Conspirator "A" is Defense Minister Amani).[3] Furthermore, Minister Amani had the funds transferred from a bank account in New York that serves the Ivoirian mission to the United Nations for the "purchase of telecommunication equipment" and "solar panels" on behalf of the government, *see* Bank Records, Dkt. No. 144-4, yet those involved had inspected the arms and thus presumably knew that the invoices were falsified, *Shor* Affidavit ¶¶ 44-45, 49-52; *Yao* Affidavit 3; *Yao* Sentencing Mem. 4-5. To all appearances, the Minister Amani and the other Ivoirian "co-conspirators" involved were acting in their official capacity when they entered into the transaction, rendering the transfer of funds to the ICE San José account "voluntary." There is no evidence that the Ivoirian representatives' actions in entering into the illegal agreement were ultra vires.

Moreover, it is not clear that Minister Amani's actions were illegal under Ivoirian law such that they could be deemed *ultra vires* on this basis. The scope of a foreign official's authority is measured by the domestic law of the *foreign state*, not by international law or U.S. domestic law. *Doe v. Qi*, 349 F. Supp. 2d 1258, 1283 (N.D. Cal. 2004). Thus, while the Ivoirian's agreement to purchase the embargoed arms was illegal under both international law and the United States' domestic laws, the relevant inquiry is whether their actions were authorized under *Ivoirian* law. The Cote d'Ivoire argues that defendants and Minister Amani violated various provisions of the Cote d'Ivoire's Penal Code, specifically, Article 401 and Articles 223-230. Pet'r's Reply 8, Dkt. No. 151. As far as the court can tell given the parties nominal citations to the French language code, none of the cited provisions provide that it would be illegal under *Ivoirian law* for an Ivoirian official to violate international laws or the laws of another country.[4] Here, with the exception of Minister Amani's agreed upon fifty percent cut of Shor's commission, there is no evidence that

---

[3] The other "co-conspirators," including Minister Amani, were not arrested with defendants Yao and Shor because: (1) one was entitled to leave based on his "status in the United States," and (2) the others were entitled to diplomatic immunity and the government permitted them to remain in the country to serve as potential witnesses. Gov't Sentencing Mem. in *United States v. Shor* 4-5, Dkt. No. 108.

[4] Article 401 appears to relate to the abuse of power or breach of trust by anyone who misappropriates goods or funds given in trust; and Articles 223-230 appear to relate more specifically to public officials who, in pertinent part: (1) act contrary to the law or government orders, (2) divert or misappropriate public funds, or (3) take kickbacks or give bribes.

ORDER
Case No. C-10-00434 RMW
AG / GH
- 10 -

Minister Amani acted contrary to government orders, diverted public funds away from the country or otherwise violated Ivoirian law. Minister Amani purchased the arms in question for the primary purpose of benefiting the sovereign by arming the Ivoirian Gendarmerie, and not for private financial gain.

Minister Amani's fifty percent cut of Shor's commission, however, would presumably be a kickback for private financial gain in violation of his fiduciary duties to the Cote d'Ivoire. If the Cote d'Ivoire could prove that Minister Amani was, in fact, taking such a commission, which appears to violate Ivoirian law, the Cote d'Ivoire might be entitled to a return of the illicit profit Minister Amani made on the transaction. *See e.g.*, *St. James Armenia Church of Los Angeles v. Kurkjian*, 47 Cal. App. 3d 547, 553 (1975) (noting that "the usual theory upon which a principal recovers secret profits garnered by his agent is by imposition of a constructive trust."). Since Shor was willing to accept fifty percent of the commission, the other fifty percent of the commission presumably could have been retained by the Ivoirian government. *See, e.g.*, *id.*, 47 Cal. App. at 551-52 (inferring that a secret agreement to split a commission indicated a broker's willingness to accept a lesser commission). However, "[o]ne cannot be held to be a constructive trustee of something he has not acquired." (*quoting Ward v. Taggart*, 51 Cal. 2d 736, 742 (1959). Here, neither Shor nor Amani ever acquired the commission and for this reason, could not have held it in a constructive trust for the Cote d'Ivoire. Nor has the Cote d'Ivoire made a claim to any specific amount based on Shor's allegedly inflated commission. Because the Cote d'Ivoire seeks only the entire $3,923,030 purchase price and because neither Shor nor Amani actually received the commission, the court does not make any finding that the Cote d'Ivoire had an ownership interest in Minister Amani's fifty percent cut of Shor's commission (which appears from the record to have been around $280,000 out of the total $3,923,030 purchase price).

Even if a fact finder were to draw all reasonable inferences in favor of the Cote d'Ivoire, the court finds that the Cote d'Ivoire could not demonstrate by preponderant evidence that Minister Amani's actions were *ultra vires* or otherwise not attributable to the sovereign. Moreover, under a totality of the circumstances analysis, the court concludes that Amani's actions bind the sovereign even if they were not expressly authorized or known by Presdent Gbagbo or his regime. For these

reasons, the court concludes that the Cote d'Ivoire retained no property interest in the funds transferred to the ICE San José account.

### 4. The Doctrine of *in Pari Delicto*

As a general rule, the doctrine of *in pari delicto* bars those who voluntarily pay money in furtherance of an illegal contract to obtain the assistance of the courts in recovering that money. *Kardoh*, 572 F.3d at 700-01 ("[N]either party to an illegal contract will be aided by the court, whether to enforce it or set it aside." (quoting *United States v. Farrell*, 606 F.2d 1341, 1348-49 (D.C. Cir. 1979)). The Cote d'Ivoire argues that *Kardoh* carves out an exception to this doctrine in cases where the government acts in bad faith. *See id.* at 702 ("There is no basis to conclude that the government acted here in bad faith. If there were, that would be a factor to consider in whether the court should exercise jurisdiction over or grant the claimant's motion."). Cote d'Ivoire argues that even if the sovereign ultimately *knew* that the transaction was illegal, the sovereign was ultimately "a victim" to bad faith representations of the United States' agents promulgating the fraudulent transaction, and thus the doctrine of *in pari delicto* does not apply.

The dicta that the Cote d'Ivoire cites form *Kardoh* does not indicate that a bad faith action on behalf of the federal agents would necessarily preclude the application of the doctrine, but rather would be "a factor to consider in whether the court should exercise jurisdiction." 572 F.3d at 702. The court is persuaded that the doctrine of *in pari delicto* applies here. As discussed *supra*, there is no evidence to suggest that the United States agents acted in bad faith. The government agents informed defendant Shor and Minister Amani that the transaction was illegal, the Ivoirian "co-conspirators" involved saw the falsified invoices for the sale, and the Ivoirian government nevertheless proceeded to make the purchase. As a party *in pari delicto* to the illegal transaction, the Cote d'Ivoire has no viable claim to the funds it transferred in furtherance of that transaction.

### C. The Cote d'Ivoire's Rule 56(d) Affidavit

The Cote d'Ivoire represents that it needs discovery of the entire government file in the underlying criminal case, specifically the ICE Undercover Agent's report, to determine which Ivoirian officials were involved in the illegal scheme and to fully understand the entire transaction. *See* Affidavit ¶¶ 8-12, Dkt. No. 154. The Cote d'Ivoire further represents that discovery will help

gather facts that: (1) N'Gbichi was unaware of the illegal scheme; and (2) "help establish a more factual basis for the [Cote D'Ivoire's] invocation of the entrapment defense." *Id.* ¶¶ 10, 13-15.

Along with the Rule 56(d) affidavit, Cote d'Ivoire submits: (1) a declaration from former Ivoirian advisor Jean Ghislain N'Gbichi, the official who wired the Cote d'Ivoire's funds to the ICE San José account, stating that he was not aware that defendant Shor and Minister Amani agreed to purchase arms illegally and that he "never would have wired the funds if [he] had known that Shor and Minister Amani did not complete the process as they told us," N'Gbichi Decl., Dkt. No. 154-1; (2) a letter from N'Gbichi to Mr. Shor requesting certification of the legality of the transaction; and (3) the government's objections to the Cote d'Ivoire's discovery request.

First, further evidence indicating that N'Gbichi or the Ivoirian government did not authorize or know about Minister Amani's actions could not help the Cote d'Ivoire defeat the government's motion for summary judgment. As the court explained *supra*, even if it is true that president Gbagbo or his regime did not know that Minister Amani wired the funds in furtherance of an illegal transaction, Minister Amani's direction of that transaction for the general purpose of obtaining arms for the sovereign binds the sovereign. Second, the entrapment defense is not an issue in this action. The merits of the underlying criminal case are not subject to relitigation in an ancillary proceeding. *United States v. Lazarenko*, 575 F. Supp. 2d 1139, 1140, 1147 (N.D. Cal. 2008) ("Put simply, 'the criminal forfeiture statutes do not afford the third party any right to challenge the underlying basis of the forfeiture.'" (quotation omitted)). Accordingly, the court concludes that further discovery in this case is unwarranted.

### D. The FSIA

The Cote d'Ivoire also argues that its property is immune from forfeiture under the Foreign Sovereign Immunities Act ("FSIA"). The Cote d'Ivoire's argument that the funds are immune from forfeiture under the FSIA would apply only if the Cote d'Ivoire retained a property interest in the funds. Because the court concludes that the Cote d'Ivoire retained no interest in the funds once transferred, the court need not address the applicability of the FSIA.

### III. ORDER

For these reasons, the court GRANTS the governments motion for summary judgment, DENIES the Cote d'Ivoire's cross-motion for summary judgment, and order the funds forfeited to the United States.

Dated: November 1, 2013



RONALD M. WHYTE
United States District Judge